THE JEWETT LAW GROUP, INC.
BRADLEY E. JEWETT (BAR NO. 222773)
355 S. Grand Ave., Suite 2450
Los Angeles, California 90071
Phone: (213) 943-1334
Fax: (213) 402-2797
Brad@JewettLawGroup.com

Attorneys for Plaintiff
NWS Corporation

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NWS CORPORATION, a Massachusetts corporation,<br><br>Plaintiff,<br><br>v.<br><br>DISH NETWORK LLC, a Colorado limited liability company,<br><br>Defendant. | Case No. '13 CV2247 GPC BGS<br><br>**VERIFIED COMPLAINT FOR:**<br><br>1. **PRELIMINARY INJUNCTIVE RELIEF**<br>2. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>3. **TORTIOUS INTERFERENCE OF BUSINESS**<br>4. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>5. **REFUSAL TO FURNISH SERVICE IN VIOLATION OF 47 U.S.C. 201(A)**<br>6. **UNFAIR BUSINESS PRACTICES**<br><br>**REQUEST FOR JURY TRIAL** |

[1]
COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION, ETC.

1    Plaintiff NWS Corporation ("NWS") alleges as follows:

2       1.    Plaintiff NWS is a corporation with its principal place of business in

3    Westfield, Massachusetts.  NWS is a system integrator, that utilizes satellite, fiber

4    optic, wireless, and other technologies to provide its clients with privately owned

5    broadband networks that are flexible, scalable, and customized to the property owners

6    requirements.  NWS's clients include corporations, commercial-property owners,

7    educational institutions, health-care facilities, state prison systems, hospitality

8    businesses, and military bases. In California, NWS services seven military bases,

9    including one veterans hospital, reaching a total of approximately 4,000 end user

10   locations consisting of hospital beds, wounded warrior rehabilitation programs,

11   offices, lounges, and other quality of life and core mission areas.

12      2.    Defendant Dish Network LLC ("Dish") is a Colorado limited liability

13   company with its principal place of business located in Englewood, Colorado.

14                         **Jurisdiction and Venue**

15      3.    Jurisdiction is proper in the United States District Court based on

16   diversity, under 28 USC § 1332(a).  The amount in dispute exceeds $75,000, and

17   NWS and Dish are citizens of different states.

18      4.    Venue is proper in this Court under 28 USC §1391(b)(2), because the

19   events giving rise to this action occurred in San Diego County, in the State of

20   California.

21                         **GENERAL ALLEGATIONS**

22                         **NWS's Business**

23      5.    NWS bids for projects with potential customers that include

24   universities, prison systems, and military installations.  When NWS wins a bid, it

25   subsequently provides the equipment and technology necessary for the customer to

26   receive television programming, and to distribute programming as necessary

27   throughout the customer's facility.

28

THE JEWETT LAW
GROUP, INC.

COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION, ETC.

1    6.    NWS does not generate the television signal that is transmitted through

2  its systems to customers.  Program owners / producers (such as CNN, CNBC, ESPN)

3  depend on satellite owners, such as Dish or DirecTV, to provide the transport of a

4  program signal from the programmer to a site served by system integrators like NWS.

5                    **NWS's Relationship with the Navy**

6    7.    One of NWS's clients is Commander, Navy Region Southwest

7  Command, which consists of multiple government facilities at the U.S. Naval

8  installations located in the greater San Diego area, in San Diego County (hereafter,

9  the "Navy" or the "Naval Installation").

10    8.    On August 22, 2006, NWS and the Navy entered into contract number

11  N00244-06-D-0040 (the "Navy Contract").  The Navy Contract was intended to

12  satisfy the Navy's need for commercial sources capable of providing basic television

13  services to Navy and Marine Corps Base locations within the San Diego metropolitan

14  area.

15    9.    The Navy Contract requires that NWS provide service throughout the

16  contract term, and also throughout a 90-day transition period after the expiration

17  thereof.

18    10.    The term of the Navy Contract, including the extension options set

19  forth therein, was from October 1, 2006, through and including September 30, 2011.

20  The Navy Contract was extended by a multiple monthly extension options through

21  August 31, 2012.

22    11.    On August 31, 2012, NWS and the Navy entered into a formal written

23  extension of the Navy Contract (the "Bridge Contract").  Under the Bridge Contract,

24  the term of the Navy Contract, and the rights and obligations thereunder, was

25  extended through and including July 31, 2013.

26                    **NWS's Relationship with Dish**

27    12.    NWS and Dish entered into a retailer agreement with an Effective Date

28  as of December 31, 2010 (the "Dish Agreement").  Under the Dish Agreement, NWS

THE JEWETT LAW
GROUP, INC.
                                [3]
                 COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION, ETC.

1 | agreed to procure, set up, and service certain institutional customers desiring
2 | television programming, and in exchange for monthly payments, Dish would provide
3 | the satellite television programming signal. Based on the Dish Contract, Dish was
4 | responsible for providing satellite television programming signal for NWS to dispense
5 | to the Navy and the Naval Installation. The Dish Agreement is confidential, and
6 | therefore is not attached to this Complaint.

7 |      13.     Dish Agreement section 17.5 provides, in pertinent part, that
8 | subsequent communications will be binding upon the parties if those communications
9 | are: "(i) in writing; (ii) bear [ ] a date contemporaneous with or subsequent to the
10 | Effective Date; and (iii) [are] signed by both parties to this Agreement."

11 |      14.     The initial term of the Dish Agreement ran through December 31, 2012.

12 |      15.     At the time NWS and Dish entered into the Dish Agreement, Dish was
13 | aware of NWS's contractual obligations to the Navy at the Naval Installation. Dish
14 | was advised of all contractual terms and was provide copies of the contract between
15 | the Navy and NWS – including the 90-day transition period and the controlling
16 | Federal Acquisition Regulations – and had ample time to review the contract
17 | documents before authorizing service at the Naval Installation.

18 | **Dish Audit and Contract Modification**

19 |      16.     Around October of 2012, Dish contacted NWS to discuss a service
20 | issue at the Naval Installation. Dish operations analyst Amy Schiff subsequently
21 | demanded an audit of NWS's activities at the Naval Installation, as well as at other
22 | facilities. As part of this audit, Dish requested, and was once again provided copies
23 | of NWS's contracts with the Navy.

24 |      17.     According to Dish, the audit revealed a variance in end user locations at
25 | one of the seven facilities at the Naval Installation, which purportedly resulted in a
26 | billing and payment discrepancy. Dish also audited sites outside of the Naval
27 | Installation, but found no other variances.

28 |

1    18.    Despite the fact that NWS did not bill or receive payment for the

2  unknown end user locations, NWS paid Dish a confidential sum to close the

3  perceived financial gap created by the alleged variance.

4    19.    On October 4, 2012, Ms. Schiff identified certain tasks that NWS was

5  required to complete for NWS to continue its relationship with Dish, as well as

6  several new terms and conditions to the parties' relationship.

7    20.    On October 5, 2012, Ms. Schiff sent a follow-up email to NWS noting

8  that she "left off one bullet point," which was that "[t]hese properties will be

9  supported through the contract between NWS and the property.  Once the contract has

10  ended, the properties are either to be disconnected or billing transitioned directly to

11  Dish."

12    21.    NWS agreed to proceed under the terms set forth in Ms. Schiff's

13  October 4 and 5, 2012 emails, which together constitute a written modification of the

14  Dish Agreement.

15    **The Second Navy Contract Extension**

16    22.    In May of 2013, the Navy advised NWS that it required a one-year

17  extension of the Bridge Contract.  On May 30, 2013, the Navy confirmed this need in

18  writing (the "Service Extension Letter"), as follows:

19    We appreciated the opportunity to discuss various issues with NWS,
20    including Navy's expressed need for continued service during the
21    upcoming one-year extension of the existing contract
22    The extension requires NWS to continue providing television and
       broadband services to: Commander, Navy Region Southwest Command
23    (CNRSW or Navy) Navy Medical Center San Diego (Balboa Hospital) and
24    its Wounded Warrior Program; and sailors and marines under the existing
25    contract.  We take note of NWS' willingness to work with Navy and
       ensure that CNRSW and tenant commands, wounded military members,
26    sailors and marines enjoy television and broadband Internet service
27    without interruption.

28

THE JEWETT LAW
GROUP, INC.

[5]
COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION, ETC.

23.     The Service Extension Letter notes the Navy's concern "about a potentially significant service gap for the Command, its sailors, marines, [and] wounded warriors that rely on NWS for television and broadband service.  Service outage and service gaps would have an adverse impact to military members Quality of Life (QOL) and mission."  The Service Extension Letter identifies further harm that would arise from a service outage at the Naval Installation, as follows:

> Gaps in service would have a negative mission impact – affecting Command morale and, both directly and indirectly, Navy operations. These services also aid in wounded warrior recovery efforts.  The men and women of the Navy that view content provided by Dish Network via NWS depend on television programming for both information and entertainment; and, television and broadband services do provide port and local information for ships' company.

24.     Finally, the Service Extension Letter explains that:

> Navy's primary goal is to ensure service continuity for all Navy viewers. We therefore request that Dish Network honor the above-mentioned one-year extension of the contract, and continue its service to NWS through 31 July 2014.  This is a high priority short-term requirement for continued service via existing "as-is, where-is" infrastructure….
> Navy's contract extension would require NWS to continue to provide service through 31, July 2014, plus an additional 90-day transition period, if needed.  Navy will then have a competitive longer-term contract in place.
> Dish Network's continued distribution of content would allow uninterrupted service to Balboa Hospital and its Wounded Warrior Program, CNRSW, Tenant-Command 'Command Control areas, and Morale, Welfare and Recreation (MWR) areas.

25.     NWS provided Dish with a copy of the Service Extension Letter.  Dish failed and refused to provide a substantive response regarding its position.

26.     Anticipating Dish might wrongfully terminate service on July 31, 2013, NWS and the Navy entered into an emergency Master Antenna Television service

1 (MATV) contract on July 31,2013, with a one year term, from August 1, 2013 to July
2 31, 2014 (the "MATV Contract"). Under the MATV Contract, NWS agreed to
3 provide the Navy and the Naval Installation with limited free local over the air
4 programming through a Master Antenna Television technical service. In other words,
5 local television programming would be available to the Navy and the Naval
6 Installation, but no satellite news or information channels. NWS and the Navy
7 entered into the MATV Contract to insure a limited level of continuity of television
8 service if Dish terminated television programming signal at 12:01 a.m. August 1,
9 2013, as threatened.

10                    **Dish Refuses to Perform Under the Dish Contract**

11       27.     NWS is informed and believes, and thereon alleges that in early 2013,
12 Dish came to the conclusion that it could increase its profit margin at the Naval
13 Installation by eliminating NWS from the equation, and contracting with the Navy
14 directly.

15       28.     In May of 2013, Ms. Schiff advised NWS that Dish intended to
16 terminate all services at the Naval Installation after July 31, 2013.

17       29.     Ms. Schiff stated that for the Navy to continue to receive Dish's
18 television programming services, the Navy would have to contract directly with Dish.

19       30.     NWS responded that pursuant to the Federal Acquisition Regulations,
20 the Navy could not arbitrarily select Dish as the new vendor, without first bidding the
21 project out to other potential vendors. Dish was further advised that the procurement
22 process would take the Navy between 6 and 12 months to complete.

23       31.     On June 17, 2013, in a telephonic conference between NWS, Dish, and
24 Navy senior Contract Officer James L. Browley, Mr. Browley reiterated the fact that
25 the Federal Acquisition Regulations govern the bidding process for future service
26 contracts. Dish nevertheless emphatically confirmed its intention to terminate
27 television programming service at the Naval Installation on July 31, 2013 unless the
28 Navy agreed to contract directly with Dish.

1        **Dish Terminates Service at the Naval Installation.**

2        32.      Dish did not terminate television programming service at the Naval

3   Installation on 12:01 a.m. on August 1, 2013, as threatened.

4        33.      Instead, Dish terminated television programming service at the Naval

5   Installation on August 12, 2013.

6        34.      Dish thus breached the Dish Contract by failing to provide service

7   through the 90-day transition period following the conclusion of the Bridge Contract.

8        35.      NWS is informed and believes, and thereon alleges that Dish hoped to

9   manipulate and coerce the Navy into contracting with Dish directly by terminating the

10  television programming signal at the Naval Installation in this manner.

11       36.      While Dish's above-mentioned breach of the Dish Contract is

12  actionable, this lawsuit is not based on any matter, claim or cause of action arising

13  from the Dish Contract.  The Dish Contract has no bearing on this lawsuit.

14       **NWS Secures Alternate Television Programming Signal for the Navy.**

15       37.      Based on Dish's refusal to provide television programming signal to

16  the Naval Installation after August 12, 2013, NWS and the Navy proceeded under the

17  MATV Contract.  However, the Navy subsequently requested that NWS find a way to

18  secure and transmit certain limited satellite programming to the Navy and the Naval

19  Installation.  On August 30, 2013, NWS and the Navy modified the MATV Contract

20  to include limited satellite programming, including CNN, HLN, TBS, TNT, MSNBC,

21  CNBC and ESPN.

22       38.      On or about September 4, 2013, NWS entered into a contractual

23  relationship with television programming provider 4Com for certain television

24  programming for the Navy and the Naval Installation (the "4Com Contract").  Under

25  the 4Com Contract, NWS utilized television-programming signals provided by 4Com

26  to satisfy the Navy's service requirements at the Naval Installation.  Under the 4Com

27  Contract, NWS provided the Navy and the Naval Installation with television

28  programming that includes CNN, HLN, TBS, TNT, MSNBC, CNBC and ESPN.

THE JEWETT LAW
GROUP, INC.

[8]
COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION, ETC.

39.     In NWS's relationship with 4Com, Dish is what is known as a transport
provider.  In other words, Dish is a common carrier of the television programming
signal provided by 4Com.  Dish is not the television programming provider (such as
CNN and ESPN).  Dish merely allows programmers to transmit their programming
through Dish's satellite network for providers like 4Com.  In exchange, Dish receives
a nominal monthly transport provider service fee in the amount of $10.00 per channel
for each site.  The Naval Installation consists of seven (7) sites, with seven (7)
channels provided to each site.  This results in a monthly payment to Dish in the
amount of $490.00 for transport services provided under the 4Com Contract.

**Dish Again Terminates Signal to the Naval Installation**

40.     Without warning, on Monday September 9, 2013, Dish improperly shut
down all transport provider services to the Navy and the Naval Installation.  This
effectively and immediately terminated all of the above-mentioned television
programming services that NWS and 4Com were providing to the Navy at the Naval
Installation under the 4Com Contract.  Based on this action, the Naval Installation,
and the thousands of U.S. Navy and Marines stationed there, are now without
important television services used for Navy Morale, Wellness and Recreation
programs (MWR Command), and real-time 24 hour news programs that provide the
Navy with mission critical information about global events.

41.     On September 9, 2013, NWS contacted Dish in an effort to discuss and
resolve the termination of transport provider services earlier in the day.  Dish
representative Amy Schiff advised NWS that the transport services would not be
restored.

**Dish's Conduct Causes Irreparable Harm to NWS and the Navy**

42.     Dish's actions caused and continue to cause irreparable harm to both
NWS and the Navy.  NWS has suffered, and will continue to suffer substantial
economic damage, as well as irreparable damage to its reputation in this competitive
field.  Dish's improper termination of NWS's television programming services

THE JEWETT LAW
GROUP, INC.

1  similarly caused and will continue to cause irreparable harm to the Navy, as active
2  duty sailors, Marines, and wounded veterans now cannot access the television to
3  which they are accustomed. The Navy's command center depends on these television
4  services to obtain real-time News, Weather and other mission critical activity
5  information. The Naval Installation – including its medical center – is presently
6  without vital television services, and under these circumstances, NWS cannot provide
7  an immediate remedy. By interfering with the television programming signal in this
8  manner, Dish rendered it impossible for NWS to comply with its contractual
9  obligations to the Navy under the MATV Contract. The Navy may consider this
10  disruption of television programming a breach by NWS of the MATV Contract in
11  light of the August 30, 2013 modification regarding satellite programming.

12      43.     The harm to NWS does not end there. NWS's survival in television
13  industry is in part contingent upon its ability to provide clients with reliable program
14  services. Clients who unexpectedly lose television programming services will
15  immediately lose faith in NWS and switch to a competitor. If NWS cannot provide
16  reliable broadcasting feeds, the damage to NWS's reputation will be catastrophic, and
17  possibly fatal. This type of rumor, whether true or false, will result in NWS losing
18  current clients, and will impair NWS's ability to secure future business through the
19  bidding process.

20      44.     NWS employs a team of technicians to service the Naval Installation,
21  as well as other teams for the other facilities that NWS services across the country. If
22  NWS loses the Navy as a customer, and/or other customers across the country, NWS
23  will be forced to terminate many of these employees. This will not only hurt NWS, it
24  will negatively impact the economy and destabilize the personal lives of the affected
25  NWS employees.

26      45.     NWS may face penalties if it is selected for a project currently out for
27  bid, and then it cannot perform. Many state and federal contracts impose fines if the
28  selected vendor proves incapable of producing the services promised. These fines are

1 | based on the cost for the client to rebid the job; loss of income caused by delays; and
2 | project cost increases relating to timing issues.  Furthermore, NWS could be
3 | disqualified as an approved state and/or federal vendor.

4 | 46.  NWS's client, the Navy, is also experiencing irreparable injury.  On
5 | September 9, 2013, mission critical television programming was shut off.  Active duty
6 | sailors and Marines cannot watch global events that have a direct impact on their
7 | future, or enjoy their favorite television program or sporting event.  The same is true
8 | for wounded servicemen and veterans recuperating in hospital facilities at the Balboa
9 | Naval Medical Center.  In addition, the Navy's command cannot access mission
10 | critical real-time 24-hour news information in support of classified military
11 | operations.

12 | 47.  Dish faces no significant hardship if the NWS/4Com signal is restored
13 | and transported through Dish's satellite network.  Dish can resolve this problem with
14 | the flip of a switch, at virtually no expense.  NWS and/or 4Com remain willing and
15 | able to pay Dish the $490.00 monthly service fee for this transport service.

16 | 48.  NWS therefore seeks a temporary restraining order and preliminary
17 | injunction requiring Dish to re-establish the above-mentioned television programming
18 | signal to the Naval Installation.

19 | **Dish Is Interfering With NWS's Bidding On Future Projects.**

20 | 49.  NWS recently submitted a detailed proposal in response to the Navy's
21 | Request For Proposal identified as SWRMWR-13-R-0002 (the "Navy RFP").  The
22 | Navy RFP is for a new contract for Internet and television services with the Navy at
23 | the Naval Installation with a term of up to ten (10) years.  The estimated base value of
24 | the contract is $19,000,000.  The value of other related business that NWS will
25 | engage at the Naval Installation if NWS is awarded the contract is estimated to be an
26 | additional $5,000,000 – 10,000,000.  As the incumbent Internet and television service
27 | provider at the Naval Installation, NWS is a preferred bidder on the Navy RFP, and
28 | has a high probability of being awarded the contract.

50.     NWS is informed and believes, and thereon alleges, that Dish's conduct is intended to interfere with NWS's efforts to secure the contract that will be awarded through the Navy RFP. NWS is informed and believes, and thereon alleges, that this deliberate and malicious conduct reflects Dish's desire to not only harm NWS, but ultimately, to marginalize NWS and/or put it out of business.

## FIRST CAUSE OF ACTION
### (Preliminary Injunctive Relief)

51.     NWS hereby incorporates by reference the allegations in paragraphs 1 through 50 as if fully set forth herein.

52.     NWS hereby seeks a temporary restraining order, preliminary injunction and order compelling Dish to reconnect the NWS/4Com television programming signal at the Naval Installation until the present dispute is resolved.

53.     For the reasons discussed hereinabove, this injunctive relief is warranted because both NWS and its client, the Navy, are currently experiencing and will continue to experience irreparable injury. NWS will likely succeed against Dish in litigation on the merits of the causes of action presented with this lawsuit. NWS and 4Com compensate Dish for the transport services at issue, and will continue to do so once those services are restored at the Naval Installation.

54.     The balance of the hardships relating to this request for a temporary restraining order and/or preliminary injunction tips sharply in NWS's favor.

## SECOND CAUSE OF ACTION
### (Intentional Interference with Contractual Relations)

55.     NWS hereby incorporates by reference the allegations in paragraphs 1 through 54 as if fully set forth herein.

56.     A valid contract exists between NWS and the Navy, as discussed hereinabove.

57.     Dish was and is aware of NWS's contract with the Navy.

58.     Dish's intentional acts, as discussed hereinabove, were designed to

1  induce NWS's breach of its contract with the Navy.

2     59.    Dish's intentional acts, as discussed hereinabove, were designed to

3  disrupt NWS's contractual relationship with the Navy.

4     60.    Dish's intentional acts, as discussed hereinabove, did in fact cause

5  NWS to breach its contract with the Navy, in that NWS is no longer providing the

6  television programming services that the Navy requires and expects under past and

7  present contracts.

8     61.    Dish's intentional acts, as discussed hereinabove, did in fact disrupt

9  NWS's contractual relations with the Navy, in that the Navy is no longer satisfied

10  with NWS's performance under past and present contracts.

11    62.    Dish deliberately terminated the television service NWS was providing

12  the Navy and the Naval Installation, leaving thousands of U.S. servicemen and

13  women, wounded veterans, and the Navy's command without  mission critical 24

14  hour news access and other Morale, Wellness and Recreation television

15  programming.  NWS was immediately harmed by Dish's actions, and will continue to

16  suffer harm moving forward, because Dish's conduct prevented performance or made

17  performance more expensive or difficult.  NWS's damages include lost revenue

18  accumulating at a rate of approximately $60,000 per month, plus expenses in excess

19  of $20,000 incurred attempting to rectify the situation.  NWS's damages may also

20  include the value of the contract that will flow from the Navy's RFP, if that contract is

21  awarded to another vendor as a result of Dish's disparaging comments and actions

22  about NWS. NWS's damages are ongoing and continue to evolve, and are thus

23  difficult to quantify.  However, NWS's damages will be established before, and

24  proven at trial.

25    63.    NWS is also entitled to, and hereby requests, punitive and exemplary

26  damages against Dish, based on the malicious, despicable and oppressive conduct

27  identified hereinabove.  This award should be sufficient to punish and deter Dish from

28  engaging in similar conduct in the future.

THE JEWETT LAW
GROUP, INC.

[13]
COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION, ETC.

## THIRD CAUSE OF ACTION

### (Tortious Interference of Business)

64.    NWS hereby incorporates by reference the allegations in paragraphs 1 through 63 as if fully set forth herein.

65.    NWS and the Navy are involved in a long-standing business relationship with one another, as discussed hereinabove.

66.    Dish was and is aware of this business relationship.

67.    Dish nevertheless made, and continues to make false claims and disparaging statements about NWS to 4Com in an attempt to undermine and sabotage NWS's relationship and performance ability with the Navy.  Specifically Dish has stated to 4Com, and possibly others, that NWS intentionally misrepresented the operating environment at the Naval Installation to Dish.

68.    Dish's conduct, as discussed hereinabove, was designed to interfere with NWS's business relationship with the Navy.  Dish's objective was and is to secure the Navy as a direct client of its own.  Dish is attempting to achieve that end by poisoning NWS's business relationships with 4Com and the Navy.

69.    Dish's conduct, including the arbitrary terminating television programming services to the Naval Installation in August and again in September of 2013, and the false claims and disparaging statements made about NWS to 4Com, and possibly others, have chilled the business relationship between NWS and the Navy.  It is now less likely that NWS will be awarded the multi-million dollar contract that will flow from the Navy RFP, or other future contracts with the Navy.

70.    Dish deliberately terminated the television service NWS was providing the Navy and the Naval Installation, leaving thousands of U.S. servicemen and women, wounded veterans, and the Navy's command without mission critical television programming.  NWS was immediately harmed by Dish's actions, and will continue to suffer harm moving forward, because Dish's conduct prevented performance or made performance more expensive or difficult.  NWS's damages

1  include lost revenue accumulating at a rate of approximately $60,000 per month, plus
2  expenses in excess of $20,000 incurred attempting to rectify the situation. NWS's
3  relationship and service record with the Navy are now tarnished. NWS's damages
4  may also include the value of the contract that will flow from the Navy's RFP, if that
5  contract is awarded to another vendor as a result of Dish's disparaging comments
6  about NWS. NWS's damages are ongoing and continue to evolve, and are thus
7  difficult to quantify. However, NWS's damages will be established before, and
8  proven at trial.

9      71.     NWS is also entitled to, and hereby requests, punitive and exemplary
10  damages against Dish, based on the malicious, despicable and oppressive conduct
11  identified hereinabove. This award should be sufficient to punish and deter Dish from
12  engaging in similar conduct in the future.

13                      **FOURTH CAUSE OF ACTION**

14          **(Intentional Interference with Prospective Economic Advantage)**

15      72.     NWS hereby incorporates by reference the allegations in paragraphs 1
16  through 71 as if fully set forth herein.

17      73.     NWS and the Navy are involved in an economic relationship with one
18  another, as discussed hereinabove. Further, NWS is bidding on a new multi-million
19  dollar contract with the Navy, as also discussed above. As the incumbent Internet and
20  television programming provider, there is a high probability that NWS will be
21  awarded this contract.

22      74.     Dish was and is aware of NWS's economic relationship with the Navy,
23  and that NWS is bidding on a new multi-million dollar contract with the Navy. Dish
24  was and is attempting to interfere with NWS's efforts to secure this new contract
25  because Dish covets and is attempting to secure the same contract.

26      75.     Dish deliberately terminated the television service NWS was providing
27  the Navy and the Naval Installation, leaving thousands of U.S. servicemen and
28  women, wounded veterans, and the Navy's command without mission critical

1   television programming.  NWS was immediately harmed by Dish's actions, and will
2   continue to suffer harm moving forward, because Dish's conduct prevented
3   performance or made performance more expensive or difficult.  NWS's damages
4   include lost revenue accumulating at a rate of approximately $60,000 per month, plus
5   expenses in excess of $20,000 incurred attempting to rectify the situation.  NWS's
6   relationship and service record with the Navy are now tarnished.  NWS's damages
7   may also include the value of the contract that will flow from the Navy's RFP, if that
8   contract is awarded to another vendor as a result of Dish's disparaging comments
9   about NWS.  NWS's damages are ongoing and continue to evolve, and are thus
10  difficult to quantify.  However, NWS's damages will be established before, and
11  proven at trial.

12      76.     NWS is also entitled to, and hereby requests, punitive and exemplary
13  damages against Dish, based on the malicious, despicable and oppressive conduct
14  identified hereinabove.  This award should be sufficient to punish and deter Dish from
15  engaging in similar conduct in the future.

16                    **FIFTH CAUSE OF ACTION**
17      **(Violation of 47 U.S.C. 201(a) – Refusal to Furnish Service)**

18      77.     NWS hereby incorporates by reference the allegations in paragraphs 1
19  through 76 as if fully set forth herein.

20      78.     NWS is a "person" within the meaning of the Communications Act of
21  1934 (the "Act"), 47 U.S.C. § 151, *et seq*.  *See* 47 U.S.C. § 153(32).

22      79.     Dish is a common carrier within the meaning of the Act.  *See* 47 U.S.C.
23  § 153(11); Defense Procurement and Acquisition Policy Subpart 239.7401, *et seq*.

24      80.     NWS reasonably requested that Dish, in its capacity as a common
25  carrier, permit 4Com's television programming signal pass through Dish's satellite
26  network, and on to the Navy at the Naval Installation.

27      81.     While Dish's role was merely that of a transport provider, and while
28  Dish was compensated fairly for performing that service, on September 9, 2013, Dish

1 chose to block the transmission of 4Com's television programming signal to the

2 Naval Installation. Dish has failed and refused to reinstate said signals since that

3 time.

4       82.     Dish's refusal to furnish satellite television programming signals to

5 NWS's customers, including the Navy, violates Dish's duty under Section 20l(a) of

6 the Act "to furnish such communication service upon reasonable request therefor."

7       83.     NWS is therefore entitled to and hereby requests declaratory and

8 injunctive relief to halt Dish's ongoing violations of the Act.

9       84.     Dish deliberately terminated the television service NWS was providing

10 the Navy and the Naval Installation, leaving thousands of U.S. servicemen and

11 women, wounded veterans, and the Navy's command without mission critical

12 television programming. NWS was immediately harmed by Dish's actions, and will

13 continue to suffer harm moving forward, because Dish's conduct prevented

14 performance or made performance more expensive or difficult. NWS's damages

15 include lost revenue accumulating at a rate of approximately $60,000 per month, plus

16 expenses in excess of $20,000 incurred attempting to rectify the situation. NWS's

17 relationship and service record with the Navy are now tarnished. NWS's damages

18 may also include the value of the contract that will flow from the Navy's RFP, if that

19 contract is awarded to another vendor as a result of Dish's disparaging comments

20 about NWS. NWS's damages are ongoing and continue to evolve, and are thus

21 difficult to quantify. However, NWS's damages will be established before, and

22 proven at trial.

23       85.     NWS is also entitled to, and hereby requests, punitive and exemplary

24 damages against Dish, based on the malicious, despicable and oppressive conduct

25 identified hereinabove. This award should be sufficient to punish and deter Dish from

26 engaging in similar conduct in the future.

27

28

# SIXTH CAUSE OF ACTION

## (Unfair Business Practices)

86.     NWS hereby incorporates by reference the allegations in paragraphs 1 to 85 as if fully set forth herein.

87.     Dish's conduct relating to NWS and the Navy, as discussed above, constitutes an unfair business practice under California *Business & Professions Code* §17200, *et seq*. Dish's business practices disregard and defy the concept of fair competition, and are otherwise unfair, fraudulent, misleading and/or deceptive.

88.     Dish is attempting to undermine and sabotage NWS's business relationship with the Navy by refusing to allow 4Com/NWS's television programming signal to pass through its satellite network, despite Dish's duty as a common carrier to allow the signal to pass.

89.     Dish deliberately terminated the television service NWS was providing the Navy and the Naval Installation, leaving thousands of U.S. servicemen and women, wounded veterans, and the Navy's command without mission critical television programming.  NWS was immediately harmed by Dish's actions, and will continue to suffer harm moving forward, because Dish's conduct prevented performance or made performance more expensive or difficult.  NWS's damages include lost revenue accumulating at a rate of approximately $60,000 per month, plus expenses in excess of $20,000 incurred attempting to rectify the situation.  NWS's relationship and service record with the Navy are now tarnished.  NWS's damages may also include the value of the contract that will flow from the Navy's RFP, if that contract is awarded to another vendor as a result of Dish's disparaging comments about NWS.

90.     NWS alleges that these and other actions by Dish constitute unlawful, unfair, fraudulent, misleading and/or deceitful business acts, as defined in California *Business & Professions Code* §17200, *et seq*.

91.     As a direct and proximate result of Dish's unfair competition and otherwise fraudulent, misleading and/or deceitful conduct, NWS has suffered damages, and will continue to suffer damages as long as Dish is permitted to act in this manner.  NWS therefore requests temporary and/or permanent injunctive relief against Dish, as well as restitution and/or disgorgement of any ill-gotten gains or unlawful profits received by Dish arising from the above-mentioned conduct.

## PRAYER

WHEREFORE, NWS prays for relief against Dish as follows:

### On Its First Cause of Action for Preliminary Injunctive Relief

1. For a temporary restraining order and preliminary injunction in the form of an order requiring that Dish reinstate all television programming signal to the Navy at the Naval Installation.

### On Its Second Cause of Action for Intentional Interference with Contract

1. Damages in an amount according to proof;
2. Punitive and Exemplary Damages; and
3. Prejudgment interest.

### On Its Third Cause of Action for Tortious Interference of Business

1. Damages in an amount according to proof;
2. Punitive and Exemplary Damages; and
3. Prejudgment interest.

### On Its Fourth Cause of Action for Intentional Interference
### With Prospective Economic Advantage

1. Damages in an amount according to proof;
2. Punitive and Exemplary Damages; and
3. Prejudgment interest.

### On Its Fifth Cause of Action for Refusal to Furnish Service

1. Damages in an amount according to proof;
2. For a declaratory judgment that Dish is required under Sections 201(a) and

202(a) of the Communications Act of 1934 to immediately reinstate the satellite television programming signal to NWS's customers at the Naval Installation;

3. For an appropriate injunction, pursuant to 47 U.S.C. § 406 and the Court's inherent power to enforce the declaration prayed for above, compelling Dish to immediately reinstate the satellite television programming signal to NWS's customers at the Naval Installation;

4. Punitive and Exemplary Damages; and

5. Prejudgment interest.

### On Its Sixth Cause of Action for Unfair Business Practices

1. For a temporary restraining order and preliminary and or permanent injunction in the form of an order requiring that Dish reinstate all television programming signal to the Navy at the Naval Installation.

2. Restitution and/or disgorgement of any ill-gotten gains or unlawful profits received by Dish arising from its unlawful conduct.

### On all Causes of Action

1. An award of NWS's attorneys' fees incurred in this action, to the extent permitted by contract and/or statutory authority;

2. An award of NWS's costs of suit incurred herein; and

3. All other relief this Court deems just and equitable.

### REQUEST FOR JURY TRIAL

Plaintiff hereby requests a Jury Trial in this action.

Dated: September 18, 2013                THE JEWETT LAW GROUP, INC.


By: _____
      BRADLEY E. JEWETT
      Attorneys for Plaintiff
      NWS CORPORATION

1

**VERIFICATION**

2

3    I, Douglas DeLeo have read the foregoing Verified Complaint and know its

4    contents.

5    I am the Chief Executive Officer of NWS Corporation, the plaintiff in the above-

6    entitled action. On behalf of NWS Corporation, I hereby verify that the matters stated

7    in the foregoing paragraphs are true and correct, based on my personal knowledge,

8    except as to those matters which are stated on information and belief, and as to those

9    matters, I am informed and believe they are true.

10    I declare under penalty of perjury under the laws of the State of California and

11    the United States of America that the foregoing is true and correct.

12    Executed this _15_ day of September 2013, at Westfield, Massachusetts.

13

14

15    DOUGLAS DeLEO

16

17

18

19

20

21

22

23

24

25

26

27

28

THE JEWETT LAW
GROUP, INC.

[21]
COMPLAINT FOR DAMAGES, PRELIMINARY INJUNCTION, ETC.